AUSA Hanlon

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>ONE LG MODEL LS620, SERIAL NUMBER 410CYAS0426072, MEID 270113183810602105; AND<br><br>ONE LG MODEL LGMS450, SERIAL NUMBER 410CYW121273, IMEI 014153001212738 | FILED UNDER SEAL  19 - 2 7 6 9  JMC<br><br>MISC. NO. |

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR A SEARCH WARRANT

Your affiant, Task Force Lilly of the Federal Bureau of Investigation ("FBI"), being duly sworn, hereby deposes and states as follows:

### INTRODUCTION

1. Your affiant submits this affidavit in support of a search warrant that would authorize the search of the following electronic devices that were seized during the search of Rayshawn ROBERTS' residence on July 25, 2019:

   LG MODEL LS620, SERIAL NUMBER 410CYAS0426072, MEID 270113183810602105; and

   LG MODEL LGMS450, SERIAL NUMBER 410CYW121273, IMEI 014153001212738

2. The above-described electronic devices are also described in Attachment A and collectively referred herein as the "SUBJECT ELECTRONIC DEVICES." The SUBJECT ELECTRONIC DEVICES are currently in the custody of the FBI Baltimore Division within the District of Maryland. The SUBJECT ELECTRONIC DEVICES remain the same, or substantially similar

1

condition, as when they were first seized by law enforcement officers. The information sought to be obtained from the authorized searches, and the protocols to be followed in conducting the searches are set forth in Attachment B.

## AFFIANT EXPERIENCE

3. I am a Detective with the Baltimore Police Department. I am also deputized as Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), assigned to the Safe Streets Task Force. I am therefore an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I joined the Baltimore Police Department in November 2004. After completing entrance training, I was assigned to the Central District Patrol Division, where I patrolled the Upton and Reservoir Hill communities. These neighborhoods are notorious for narcotics and vice activity. While a patrol officer, I participated in the execution of numerous search and seizure warrants and made more than two hundred arrests for narcotics violations. Since 2013, I have held the rank of Detective in the Baltimore Police Department. Since becoming a Detective, I have actively participated in investigations of criminal activity, including but not limited to investigations of drug trafficking. During these investigations, I have participated in the execution of search warrants and the seizure of evidence, including evidence related to drug trafficking activities. I have also applied for and served as the affiant for search and seizure warrants. These investigations have resulted in the arrest and conviction of numerous individuals responsible for trafficking narcotics and committing violent crimes. Since October 2015, I have also been an FBI TFO, and assigned to the operational intelligence section of the Baltimore Safe Streets Task Force investigating violent

2

criminal organizations. In that capacity, I have been involved in drug investigations, including Organized Crime Drug Enforcement Task Force (OCDETF) investigations involving the trafficking of cocaine and heroin.

4. I am familiar with the language, terminology, and street slang used by persons who purchase and distribute controlled dangerous substances ("CDS.") I am also familiar with the prices and packaging and paraphernalia used to distribute and manufacture CDS. I have surveilled numerous narcotics transactions on the streets of Baltimore City and within the Baltimore metropolitan area.

5. I have interviewed confidential informants, cooperating witnesses, street level, mid-level, narcotics distributors/traffickers, and narcotics users. This has provided me with an intimate insight into drug trafficking patterns. I am also familiar with the counter-surveillance techniques utilized against law enforcement by drug traffickers.

6. I am familiar with the violence associated with individuals involved in narcotics trafficking organizations. Individuals in these organizations are known to possess firearms for protection of themselves and their drug products. These individuals are also known to retaliate against other narcotics distribution organizations due to loss of product or distribution territory.

7. Additionally, based on my training and experience and participation in multiple narcotics investigations, I know the following: that it is common for drug dealers to "front," or provide on consignment, controlled substances to their customers; that it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence, vehicles and/or their businesses for ready access; to conceal proceeds from law enforcement authorities and rival narcotics traffickers; that drug dealers routinely use cellular telephones and other electronic communication devices to facilitate their drug distribution operations; that drug dealing is an ongoing process that requires the development, use, and

3

protection of a communication network to facilitate daily drug distribution; that drug dealers use telephones to thwart law enforcement efforts to penetrate the drug dealers' communication networks; that narcotics traffickers frequently transmit to one another prearranged numeric code, specifically to indicate the quantity and/or price of narcotics, or a predetermined code to identify the caller or meeting location, and that narcotics traffickers commonly use "coded" language when speaking with other drug traffickers in order to thwart detection by law enforcement agents who may be intercepting their communications; that narcotics traffickers may routinely "drop," or discard, their cellular telephones or other communication devices in an effort to thwart detection by law enforcement agents who may be intercepting their communications. I also know that narcotics traffickers frequently use multiple telephones to conduct business—for example, using one telephone to speak to customers, and another to speak to suppliers.

8. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the search of the SUBJECT ELECTRONIC DEVICES, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substances and in part unless otherwise indicated. Summaries and descriptions, including quotations, of recorded conversations are based on my review of the audio recordings. Because this investigation has relied upon the interception of wire and electronic communication over cellular telephones, I have included my interpretation of those communications throughout this affidavit, and in some instances have placed in brackets my

4

"translation" of the words or terminology used. These interpretations, as well as my opinions contained herein, are based upon my training, experience, knowledge of drug trafficking organizations ("DTOs") in general, and of this particular DTO's operations.

## PROBABLE CAUSE

9. On or about August 2018, the FBI began an investigation of multiple drug traffickers operating in and around Baltimore City. Based on evidence gathered to date through this investigation, investigators identified Jebriel ALI a/k/a "Bril" as a narcotics trafficker and leader of a street-level drug trafficking organization (hereinafter referred to as the "ALI DTO") in Baltimore, Maryland. During the course of the investigation, federal investigators conducted a wiretap investigation and monitored cellular phones used by members of the ALI DTO, including the following cellular phones: 443-743-4501 (hereinafter "Target Telephone 1"), 443-931-6317 (hereinafter "Target Telephone 2"), and 443-469-6754 (hereinafter "Target Telephone 3"), all used by ALI; 443-900-7938 (hereinafter "Target Telephone 4"), used by co-conspirator John Paul JONES; and 443-308-7556 (hereinafter "Target Telephone 5"), used by co-conspirator Jamal RINGGOLD.

10. Investigators learned over the wiretap intercepted communications of ALI, JONES, and RINGGOLD telephones that the ALI DTO is a tiered organization consisting of multiple members who participate in drug trafficking. Investigators identified a large majority of narcotic trafficking communications were filtered through ALI, since he is believed to be the leader of the DTO. Additionally, investigators identified ALI, JONES, and RINGGOLD as sources of supply to the Irvington community located in Baltimore.

11. On March 27, 2019, at approximately 8:34 a.m., ALI received a telephone call on Target Telephone 1 from an unidentified male using telephone number (443) 891-7153. UM7153 told

5

ALI he would not be home but the door would be open, and he could go in and grab them. Following that call, investigators witnessed ALI exiting a residence in the vicinity of the 400 Block of South Wickham Road and Cedar Gardens Road. ALI was carrying a yellow plastic shopping style bag and entered his known Honda Accord. At approximately 2:11 pm that same day, investigators witnessed ALI placing the same brightly colored yellow bag in a 2003 Acura 3.2CL bearing Maryland license tag 3DR1300. ALI then closed the door and departed the area. Based on those observations and other information obtained during this investigation, investigators obtained a search warrant for the Acura. Upon executing the warrant, investigators recovered quantities of heroin, fentanyl, 2 ballistic vests, an M11 9mm, a Glock 19 handgun, an MDLPAP-M92PV 7.62mm rifle, a Sig Sauer 9mm handgun, and multiple rounds of ammunition. The circumstances indicate that ALI was making use of the Acura as a stash location for drugs and guns. None of the targets related to ALI were arrested by investigators at that time in order to further develop the investigation.

12. On May 21, 2019, FBI investigators and Baltimore Police Department ("BPD") officers attempted to conduct a traffic stop on ALI in the vicinity of McCurley Street and Old Frederick Road in Baltimore, Maryland. ALI failed to stop and fled from his vehicle in the vicinity of the 200 Block of McCurley Street, where he was apprehended in the vicinity of the Sarah M. Roach Elementary School. While securing ALI's vehicle after ALI's arrest, BPD officers and FBI investigators observed a pistol with an extended magazine in the map pocket in the passenger seat of his vehicle. Incident to ALI's arrest, investigators recovered an additional firearm and suspected heroin from an ALI DTO stash location in the vicinity of Beechfield Elementary School in Baltimore, Maryland.

13. On July 10, 2019, a federal Grand Jury for the United States District Court for the District

of Maryland indicted ALI, along RINGGOLD, Rashawn ROBERTS and others.

14. Based on the investigation and evidence recovered, investigators identified additional locations believed to contain drug trafficking evidence.

### EVIDENCE OF RAYSHAWN ROBERTS' DRUG TRAFFICKING ACTIVITY

15. During the course of the investigation, investigators identified Rayshawn ROBERTS as a co-conspirator and drug trafficker for the ALI DTO. Investigators identified ROBERTS during the course of wire and electronic interception communications over Target Telephone 5 (utilized by RINGGOLD). As a result of the investigation, investigators identified Rayshawn ROBERTS (M/YOB: 1991) and his cellular phone number 410-982-3334. Based on intercepted communications and surveillance, investigators learned that ROBERTS resides at 4228 Frederick Avenue, Baltimore, Maryland (hereinafter the SUBJECT RESIDENCE[1]). Investigators believe ROBERTS orchestrated multiple narcotics-related transactions with RINGGOLD and, as such, he is believed to be a narcotics supplier in the Irvington community.

16. For example, on May 7, 2019, at approximately 4:19 p.m., investigators utilized a pole camera in the area of Frederick Avenue and Collins Avenue and observed RINGGOLD open the front passenger door of RINGGOLD's known 2011 black BMW bearing Maryland License Plate 90177CH. Investigators then observed RINGGOLD remove a small object, and passed that object to a female later identified as having the initals TB. Based on my training, knowledge, and experience, I believe the body language exhibited between TB and RINGGOLD, the comparatively short duration of their encounter, and the size of the package passed from RINGGOLD to TB were

---

1  The SUBJECT RESIDENCE was the subject of a previous federal search warrant in which the SUBJECT ELECTRONIC DEVICES were recovered. For convenience, the Frederick Avenue residence will continue to be referred to as the SUBJECT RESIDENCE in this affidavit.

7

all consistent with a hand-to-hand narcotics sale. Additionally, based on this investigation, I know that Collins Avenue is a known violent and high-intensity drug trafficking area within Baltimore. Additionally, I know that the area in the vicinity of Frederick Avenue and Collins Avenue is heavily trafficked by the ALI DTO and is used by the ALI DTO to traffic narcotics.

17. Based on the observations, at approximately 4:25 p.m., FBI investigators requested that BPD officers stop TB and another unidentified female (UF) on the sidewalk in the vicinity of the SUBJECT RESDIENCE. BPD indicated to TB and the UF that they were being stopped based on TB carrying an open container of alcohol. When asked if the women had any illegal items in their possession, TB advised the officers that she had a bag of suspected cocaine on her person and removed the item from her back rear pocket. She refused to identify from whom she purchased the cocaine. Lab results are still pending for the suspected cocaine.

18. Shortly after TB's encounter with BPD officers, ROBERTS contacted RINGGOLD. Specifically, at approximately 4:35 p.m., RINGGOLD received a call on Target Telephone 5 from ROBERTS using telephone number 410-982-3334. Below is a transcription of the conversation.

> ROBERTS: Hey yo who. Somebody up the street out there. Hello.
>
> RINGGOLD: Yo I was just.
>
> ROBERTS: Be careful. No I'm telling you. Be careful. Whoever served somebody up there on Collins. They got this lady and this other lady out front of my door searching them talking bout they just seen them get served by somebody up the street.
>
> RINGGOLD: Aight I be back. Aight. Good looking hook it up. Aight. Aight yeah.

Call Terminated.

19. Based on my training, knowledge, and experience, I believe that ROBERTS called

8

RINGGOLD to alert him that TB and an UF were in contact with law enforcement officers. Following this phone conversation, at approximately 6:41 p.m., investigators intercepted another call between ROBERTS and RINGGOLD. During this call, they discussed the aforementioned interaction between the BPD officers and the two women. Below is a transcript of the conversation.

| | |
|---|---|
| RINGGOLD: | Yo. |
| ROBERTS: | Yo. |
| RINGGOLD: | Hey yo what you say they said? That somebody hit them up. |
| ROBERTS: | Whoever. Whoever hit them two ladies yo they was talking bout they came from Collins. |
| RINGGOLD: | What you say? |
| ROBERTS: | Whoever hit them two black bitches. The knockers was talking to them in front of the door. My mother said they said that somebody served them on Collins that's all she heard. |
| RINGGOLD: | Some weed? |
| ROBERTS: | I don't know what they got served. I was in the house. |
| RINGGOLD: | Aight. |

Call Terminated.

20. Based on this conversation, my familiarity with this investigation, and discussions with other investigators present during the sidewalk encounter with the two women, I believe ROBERTS was referring to the fact that he was at the SUBJECT RESIDENCE. For example, when ROBERTS said, "My mother said they said that somebody served them on Collins that's all she heard," and, "I was in the house," I believe that the two calls (4:35 p.m. call and the 6:41 p.m. call) between ROBERTS and RINGGOLD indicated that ROBERTS was conducting counter-

9

surveillance of law enforcement activity in the area from the SUBJECT RESIDENCE and reported this law enforcement activity to RINGGOLD.

21. On May 17, 2019, at approximately 3:01 p.m., investigators intercepted another telephone conversation between RINGGOLD and ROBERTS and they discussed ROBERTS' location. Below is a transcription of the conversation.

| | |
|---|---|
| RINGGOLD: | Yo where you at? |
| ROBERTS: | I'm out back cuz. |
| RINGGOLD: | Where at? |
| ROBERTS: | At my mommy house. |
| RINGGOLD: | Aight. |

Call Terminated.

22. In this telephone call, I believe that ROBERTS referred to the SUBJECT RESIDENCE when he said, "At my mommy house," because of ROBERTS' reference to his mother's house during the May 7, 2019 interaction between BPD officers and the two women that he reported to RINGGOLD.

23. During the investigation, investigators intercepted ROBERTS and RINGGOLD over Target Telephone 5 and they discussed a narcotic transaction. For example, on May 13, 2019, at approximately 9:30 a.m., RINGGOLD received a call on Target Telephone 5 from ROBERTS using telephone number 410-982-3334. Below is a transcription of the conversation.

RINGGOLD: On my way to you cuz.

ROBERTS: (Unintelligible).

RINGGOLD: I'm on my way yo.

ROBERTS: Hey yo what's up with you? Huh?

10

**19-2769 JMC**

RINGGOLD: Huh?

ROBERTS: How much money you got so I can so I can look out for you yo? After today I ain't working out no more.

RINGGOLD: 145.

ROBERTS: Huh?

RINGGOLD: 145.

ROBERTS: You have 145? I'ma give you three packs and I'ma give you a gram, but you gotta come to me.

RINGGOLD: (Unintelligible).

Call terminated.

24. Based on my knowledge, training, and experience, I believe that RINGGOLD and ROBERTS discussed a narcotics transaction. I believe that RINGGOLD called ROBERTS to obtain a resupply of narcotics when he said, "I'm on my way yo," and ROBERTS asked, "How much money you got so I can so I can look out for you yo?" Based on my knowledge, training, and experience, I know that narcotic trafficking organizations in Baltimore often distribute heroin for individual sale in gelatin capsules. I also know that these capsules are typically packaged for street-level distribution in packages of roughly 25 capsules. Accordingly, I believe that when ROBERTS referred to "three packs," he was referring to three packages of 25 heroin gelatin capsules which would then be distributed for street-level sale. Based on this call, I believe ROBERTS agreed to sell RINGGOLD three packs of heroin gel capsules and a gram of an unknown controlled dangerous substance (CDS) for $145. Based on the intercepted communication, investigators believe ROBERTS wanted RINGGOLD to come his residence, the SUBJECT RESIDENCE, "…but you gotta come to me."

11

25. On May 17, 2019, investigators intercepted another call between RINGGGOLD and ROBERTS who discussed a narcotic transaction. Specifically, on May 17, 2019, at approximately 2:56 p.m., RINGGOLD placed a call on Target Telephone 5 to ROBERTS on telephone number 410-982-3334. Below is an excerpt of the conversation.

RINGGOLD: Hey cuz.

ROBERTS: Yeah.

RINGGOLD: You got some grams?

ROBERTS: Nah.

RINGGOLD: You ain't got nothing?

ROBERTS: What?

RINGGOLD: Some grams.

ROBERTS: Yeah. What's up?

RINGGOLD: Uh I need a one piece.

ROBERTS: Damn you got my money from yesterday too?

RINGGOLD: Yeah. How much was it 20 dollars?

ROBERTS: Man it wasn't no motha fucking 20 dollars yo.

RINGGOLD: How much I owe you?

ROBERTS: You owe me 50 dollars yo. Fuck y'all keep thinking y'all don't owe me yo. That's why nobody getting hit there. Fuck it. I got grams.

Call terminated.

26. In this conversation, I believe that RINGGOLD called ROBERTS to obtain a resupply of narcotics. Based on my knowledge, training, and experience, I know that heroin is most often sold in gram-weight quantities. Accordingly, I believe that when RINGGOLD asked ROBERTS,

12

"You got some grams?" and stated, "I need a one piece," RINGGOLD sought to obtain a one-gram resupply of heroin for street-level redistribution from ROBERTS. I believe that ROBERTS referred to possessing a large amount of narcotics for street-level distribution when he stated, "I got *grams*."

27. Based on the May 17, 2019 intercepted communications, investigators conducted surveillance on ROBERTS and observed ROBERTS on the porch of the SUBJECT RESIDENCE. Specifically, on May 17, 2019, at approximately 5:51 p.m., investigators placed a controlled telephone call to 410-982-3334, the telephone number known to be used by ROBERTS. From the investigators' vantage point, ROBERTS was observed answering the controlled telephone call from the porch of the SUBJECT RESIDENCE.

28. On May 21, 2019, at approximately 4:07 p.m., investigators intercepted a telephone conversation between ROBERTS and RINGGOLD. Below is a transcription of the call.

RINGGOLD: Huh?

ROBERTS: Yeah.

RINGGOLD: About to pull up bro I -

ROBERTS: Mal in the alley. You gotta come on, you gotta come on. It's hot around here. Come get this shit or come get this bread, whatever you gonna do.

Call Terminated.

29. Based on my training, knowledge, and experience, I believe that ROBERTS directed RINGGOLD, a/k/a as "Mal," to meet "in the alley." Based on the investigation and prior intercepted communications, investigators believe that ROBERTS was referring to the alley behind the SUBJECT RESIDENCE. Furthermore, I believe ROBERTS was referring to narcotics when he said, "Come get this shit," and he was referring to money when he said, "Or come get this bread."

I believe that ROBERTS directed RINGGOLD behind the SUBJECT RESIDENCE in order to minimize the likelihood of detection by law enforcement when he said, "It's hot around here." I know that the term "hot" is often a reference to law enforcement. As previously indicated, the SUBJECT RESIDENCE is located in an area known for a high-level of violence and narcotic trafficking.

30. Additionally, on July 22, 2019, an individual believed to be ROBERTS was once again observed sitting on the porch of the SUBJECT RESIDENCE. Based on the above intercepted communications between ROBERTS and RINGGOLD where RINGGOLD requested large quantities of narcotics from ROBERTS, ROBERTS' reference to the alley, and investigators observations of ROBERTS at the SUBJECT RESIDENCE, investigators believed ROBERTS was a source of supply for RINGGOLD and the ALI DTO. Investigators know these large scale narcotic transactions are indicative of a source of supply, and believed ROBERTS had narcotics, contraband, cell phones, as well as possible narcotic ledgers at the SUBJECT RESIDENCE.

## SEARCH WARRANT EXECUTION AND ARREST

31. Accordingly, on July 25, 2019, investigators executed a federal search warrant on the SUBJECT RESIDENCE, 4228 Frederick Avenue, Baltimore, Maryland. At the time of the search warrant execution, ROBERTS was not at home, but his mother was present. During the search, investigators seized cash; multiple scales believed to be used in measuring narcotics for unit-level sale and distribution; a press that investigators believe the DTO used for compressing large quantities of heroin; and two cellular telephones bearing serial numbers 410CYAS0426072 and 410CYW121273 (the "SUBJECT ELECTRONIC DEVICES"). One of the SUBJECT ELECTRONIC DEVICES was found in the living room of the SUBJECT RESIDENCE; the other SUBJECT ELECTRONIC DEVICE was found in the basement of the SUBJECT RESIDENCE,

which was the room ROBERTS occupied when he stayed overnight at the SUBJECT RESIDENCE. ROBERTS's mother indicated that the SUBJECT ELECTRONIC DEVICES were not hers, but provided written consent for agents to examine and extract data from them. ROBERTS was arrested by investigators later in the afternoon of July 25, 2019.

## USE OF CELLULAR PHONES IN DRUG TRAFFICKING

32. As discussed in the paragraphs above in connection with my professional background, I am familiar with the mode of operation of individuals who commit drug trafficking offenses, including, but not limited to, their use of electronic devices to plan and coordinate drug trafficking activities. Based on my knowledge, training, and experience, individuals committing drug trafficking offenses frequently use cellular telephones, communication devices, and other electronic media storage to further their illegal activities. Based upon my training, experience and participation in this and other investigations, I know the following:

33. The fruits and instrumentalities of criminal activity are often concealed in digital form. Furthermore, digital camera technology is often used to capture images of tools and instrumentalities of pending criminal activity. All of the above cell phones have both digital storage capacity and digital camera capabilities.

34. Individuals engaged in drug trafficking offenses often use cell phones to communicate with suppliers, to place orders with suppliers, to communicate with customers, to receive orders from customers, and to arrange meeting times and locations for the distribution of controlled substances. The individuals engaging in drug trafficking will often use a combination of voice calls and text messages to coordinate drug transactions. Individuals engaged in drug trafficking offenses also use digital storage devices to maintain telephone number "contact lists" of individuals who may have assisted in the planning of this and other criminal activity.

Case 1:19-mj-02769-JMC   Document 3   Filed 09/19/19   Page 16 of 20

19-2769 JMC

35. Drug trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking is an illegal commercial activity that is characterized by regular, repeated criminal activity.

36. Cellular telephones are an indispensable tool of the narcotics trafficking trade. Narcotic traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and narcotic traffickers. In addition, narcotic traffickers will often change their cellphones following the arrest of a member of their Drug Trafficking Organization ("DTO"), or at random in order to frustrate law enforcement efforts.

37. Narcotic traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

38. Drug traffickers utilize different types of communication devices, and change the numbers to these communication devices frequently. This is done to avoid detection by law enforcement personnel. I also know that drug traffickers will dedicate different communication devices for different aspects of the trafficking organization. An example of this would be a drug trafficker utilizing one cellular telephone to communicate with customers, and utilizing another cellular telephone to communicate with a source of supply of drugs.

39. Cellular phones associated with drug traffickers include various types of evidence. Phones may contain relevant text messages or other electronic communications; they may contain

electronic address books listing the phone numbers and other contact information associated with co-conspirators; and they may contain other types of information.

40. The mere fact of a cellular phone's call number, electronic serial number or other identifying information may be evidentiary value as it may confirm that a particular cell phone is the phone identified during a wiretap, pen register, or other electronic investigation.

### FORENSIC ANALYSIS OF THE SUBJECT ELECTRONIC DEVICES

41. Based on my knowledge, training, and experience, I know that electronic devices such as cellular phones (smartphones) can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools. There is probable cause to believe that things that were once stored on the SUBJECT ELECTRONIC DEVICES may still be stored on those devices, for various reasons, as discussed in the following paragraphs.

42. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT ELECTRONIC DEVICES were used, the purpose of its use, who used it, and when.

43. There is probable cause to believe that this forensic electronic evidence might be on the Device because data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating

17

systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

44. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

45. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

46. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

47. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

48. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of

the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

49. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

50. During this case and in numerous others involving complex DTOs, investigators have learned that the drug-trafficking organization relies heavily on electronic devices to facilitate drug trafficking. It is necessary to conduct a physical inspection of the electronic devices in order to obtain electronic communications and other information that might be stored on the seized phones and to determine whether any of the seized phones were the subject of wiretap, pen register or other investigation detailed herein. The phones may also contain data and communications that were not electronically intercepted due to encryption or for other reasons.

51. Again, all of the SUBJECT ELECTRONIC DEVICES remain in the custody of law enforcement. The only known specifics of each phone requested for authorization to search are detailed in Attachment A and the types of information expected to be recovered from the devices are listed in Attachment B.

## **CONCLUSION**

52. Accordingly, there is probable cause to believe that evidence will be found from an analysis of the SUBJECT ELECTRONIC DEVICES recovered. The phones may contain records of ROBERTS' most recent calls, which may include calls with persons involved in DTO. The phones may contain copies of SMS or text or other electronic communications relating to activities associated with the DTO. The phones may also contain a variety of other electronic evidence,

including electronic communications through various cellular or internet-based applications, photographs and other information.

53. Wherefore, in consideration of the facts presented, I respectfully request that this Court issue search warrants for the SUBJECT ELECTRONIC DEVICES, and authorize the search and seizure of the items described in Attachment A, for the information set forth in Attachment B, where applicable, which constitute fruits, evidence and instrumentalities of conspiracy and drug possession with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846.

## REQUEST FOR NIGHT-TIME AUTHORIZATION

54. There is good cause for the Court to authorize the requested searches at any time of the day or night. The SUBJECT ELECTRONIC DEVICES are already in law enforcement custody, and it is reasonable to allow law enforcement to execute the requested searches at any hour of the day, even during the evening or night, if doing so is convenient for the investigators or examiners. Because the devices are in law enforcement custody already, there is no prejudice to any other person from this request.

Jeffrey Lilly
Task Force Officer
Federal Bureau of Investigation

Sworn to before me this 22 day of August, 2019 at 11:15 hours.

Hon. J. Mark Coulson
United States Magistrate Judge

20